J-S21005-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                        :          PENNSYLVANIA
                        :

         v.               :
                        :
                        :

TERRANCE CULBREATH        :
                        :

        Appellant       :   No. 1844 EDA 2023

Appeal from the Judgment of Sentence Entered March 24, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0009764-2017

BEFORE:  LAZARUS, P.J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY LAZARUS, P.J.:        **FILED SEPTEMBER 18, 2024**

Terrance Culbreath appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, following his convictions of unlawful contact with a minor—sexual offenses,[1] aggravated indecent assault—person less than 13,[2] indecent assault—person less than 13,[3] and corruption of minors.[4]  After careful review, we affirm.

The trial court set forth the following factual history:

> In the fall of 2014, N.R. was at a sleepover at [the home of her] cheerleading coach[.]  During the night, she awoke to find []

---

[1] 18 Pa.C.S.A. § 6318(a)(1).

[2] *Id.* at § 3125(a)(7).

[3] *Id.* at § 3126(a)(7).

[4] *Id.* at § 6301.

Culbreath[, the cheerleading coach's cousin,] in the bedroom. []
Culbreath sat on the bed[] and touched [N.R.'s] thigh. He also
put his finger to his mouth and shushed her. [Culbreath] then put
his hand inside of [N.R.'s] pants and digitally penetrated her
vagina. When [N.R.] cried, [Culbreath] told her to stay quiet.
When [N.R.] cried louder, [Culbreath] put his hands over her
mouth and told her to "be quiet" or else he would "hurt" her.
Another girl was sleeping in the bed at the time. Her head was
on the other side of the bed, and she was facing away from N.R.
That girl never woke up while [] Culbreath was in the room[ and]
has never been identified. The next morning, N.R. skipped the
cheerleading event and went home instead. She did not report
the incident to anyone at the time.

At the time of the offense, [] Culbreath was 25 years old, and N.R.
was 11 years old. N.R. had known [] Culbreath for 4-5 years prior
to the assault. He lived a few doors down [from the cheerleading
coach] with his family. . . .

Three years later, in August 2017, when N.R. was 14 years old,
she visited family in Virginia. During that visit, N.R. confided to
[] Katina Smith[, a friend of N.R.'s aunt,] that she had been
sexually assaulted in 2014. [] Smith immediately arranged a call
with N.R.'s mother. In that call, N.R. disclosed the assault to her
mother, [C.J.-R]. On August 17, 2017, N.R. and her mother
reported the assault to police. On August 28, 2017, N.R. met with
a forensic interviewer at Philadelphia Children's Alliance [(PCA)].
N.R. described the assault, recounting how [] Culbreath entered
the room, sat next to her on the bed, and digitally penetrat[ed]
her vagina. She also recounted how [] Culbreath repeatedly told
her to be quiet, put his hand over her mouth to quiet her, and
threatened her with physical harm if she reported the assault to
anyone.

On September 28, 2017, Detective [Thomas] Price of the
Philadelphia [Police Department's] Special Victims Unit
interviewed [] Smith by telephone because she was in Virginia.
Detective Price memorialized that interview in an [i]nvestigation
[i]nterview [r]ecord. [] Smith never reviewed or signed that
document. In that document, Detective Price wrote that [] Smith
said that N.R. initially said the person who touched her was "her
older brother's cousin." The document also indicated that [] Smith
said N.R. reported that the assault involved "having sex with her"
and "actual sex."

After interviewing [] Smith, Detective Price interviewed N.R.[, who] explained that she believed intercourse was "touching inappropriately." During the trial, N.R. explained that[,] back then[,] she believed sexual intercourse was touching.

Detective Price also interviewed [] Culbreath on September 28, 2017. In [] Culbreath's interview, he reported he was drinking heavily during the time of the assault and he would often not remember things during that period.

Trial Court Opinion, 10/10/23, at 2-3 (internal footnotes omitted).

Culbreath was charged with the above-mentioned offenses. The case was originally scheduled for trial on June 25, 2018, at which time the defense requested a continuance because Smith failed to appear at trial. During a discussion on the matter, Culbreath's counsel emphasized the importance of Smith to Culbreath's defense as a witness who would testify to N.R.'s lack of prompt complaint and to N.R.'s prior inconsistent statement. **See** N.T. Hearing Volume 1, 6/25/18, at 3-10. The Commonwealth refused to stipulate to Smith's statement to Detective Price because "it [was] otherwise a hearsay statement." **Id.** at 8. No motions related to Smith's testimony or statement appear on the record.[5]

Following a jury trial, Culbreath was convicted of all charges on December 15, 2022. Importantly,

[] Smith was not called as a witness during the trial. In lieu of [] Smith's testimony, [the d]efense sought to introduce [] Smith's

---

[5] On October 8, 2019, the trial court granted Culbreath's motion to dismiss pursuant to Pa.R.Crim.P. 600(a). Following an appeal by the Commonwealth, this Court held that the trial court erred in granting Culbreath's Rule 600 motion and remanded for further proceedings. **See Commonwealth v. Culbreath**, 249 A.3d 1189 (Pa. Super. 2021) (Table).

statements to Detective Price made during the phone interview on September 28, 2017. [Culbreath] sought to introduce [] the [i]nvestigation [i]nterview [r]ecord prepared by Detective Price memorializing the conversation. [Culbreath] also sought to elicit testimony from Detective Price directly about the statements [] Smith [made] during that phone interview. The [c]ourt ruled [] Smith's statements inadmissible as hearsay. [The court] permitted [Culbreath] to cross-examine N.R. [] regarding the possible inconsistent statements she allegedly made to [] Smith, but N.R. denied having made the statements. [The court] also permitted [Culbreath] to question N.R.'s mother regarding N.R.'s alleged statements to [] Smith, and she also denied that N.R. made those statements.

Trial Court Opinion, 10/10/23, at 5.

Prior to sentencing, the trial court ordered a pre-sentence investigation and assessment by the Sexual Offenders Assessment Board (SOAB), after which the SOAB concluded that Culbreath did not meet the criteria for designation as a sexually violent predator. At the sentencing hearing on March 24, 2023, defense counsel, William Houston, Esquire, made an oral motion for extraordinary relief in the form of a motion for a new trial, which the court denied. At the conclusion of the sentencing hearing, the trial court sentenced Culbreath to 2 to 4 years' incarceration, followed by 3 years' probation. In addition, as a result of his convictions for aggravated indecent assault—person less than 13 and indecent assault—person less than 13, Culbreath was designated as a Tier III sexual offender under the Pennsylvania Sex Offender Registration and Notification Act (SORNA). *See* 42 Pa.C.S.A. § 9799.14(d)(7)-(8). Consequently, Culbreath must register as a sexual offender for life.

Following sentencing, the court denied Attorney Houston's oral motion for reconsideration of sentence. Subsequently, Attorney Houston moved to withdraw as counsel, which the trial court granted. On April 3, 2023, the court appointed as counsel Daniel Alvarez, Esquire, who filed a post-sentence motion the same day, requesting a new trial and reconsideration of sentence. On July 7, 2023, the trial court denied the motion. Culbreath filed a timely notice of appeal and both Culbreath and the trial court have complied with Pa.R.A.P. 1925.

On appeal, Culbreath raises the following issues for our review:

1. Was the evidence insufficient to sustain [Culbreath's] convictions [where Culbreath] proffer[ed] evidence [raising] a reasonable doubt [whether] it was [Culbreath] who had entered the bedroom when [N.R.] was purportedly assaulted?

2. Were the guilty verdicts [] against the weight of the evidence[,] as the evidence was incredible that an assault occurred undetected in such a busy and crowded home full of youth cheerleaders spending the night[,] and where four men and one woman resided. Additionally, [N.R.'s] testimony was rife with material inconsistencies that rendered her testimony u[nr]eliable, and there was no physical or forensic evidence that proved any assault took place?

3. Were the guilty verdicts [] against the weight of the evidence as [Culbreath] presented substantive evidence of his reputation in the community for being truthful, non-violent[,] and law-abiding, which by itself, raised a reasonable doubt and justified a verdict of not guilty?

4. Did the trial court err by excluding at trial the introduction of prompt complaint witness [] Smith's statement to [Detective Price] for the limited purpose of impeaching [N.R.], as another [j]udge of co-equal jurisdiction had already ruled that if the Commonwealth did not stipulate to the statement (witness was not present at trial), that the court would allow it into evidence. The statement was permissible for the purpose of impeaching

[N.R.,] whose prompt complaint allegations were drastically different and implicated someone other than [Culbreath]. [The court] denied [Culbreath] a fair trial as it excluded [meaningful and exculpatory] material and reliable evidence from the jury's consideration[.]

5. Are the reporting requirements of [] SORNA unconstitutional as applied to [Culbreath], as they violate his due process rights, are punitive as applied to [Culbreath], are an *ex post facto* violation as [Culbreath] was convicted for an act that occurred in 2014[,] prior to the enactment of this version of the SORNA statute, which passed in response to the [**Commonwealth v.**] **Muniz** decision, 164 A.3d 1189 (Pa. 2017), and violate[] his reputation[] and liberty interests[ under] Pa. Const. [A]rt[.] 1[,] § 1?

Appellant's Brief, at 5-6 (internal citations omitted; claims reordered for ease of review).

Culbreath first asserts that the evidence was insufficient to sustain his convictions, claiming that N.R.'s testimony was so inconsistent and unreliable as to rise to the level of conjecture. **See** Appellant's Brief, at 26. "Because a successful sufficiency of the evidence claim warrants discharge on the pertinent crime, we must address this issue first." **Commonwealth v. Toritto**, 67 A.3d 29, 33 (Pa. Super. 2013) (en banc).

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged[,] and the commission thereof by the accused, beyond a reasonable doubt. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner[,] giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

**Commonwealth v. Dale**, 836 A.2d 150, 152 (Pa. Super. 2003) (citation and ellipsis omitted).

In reviewing a sufficiency claim, we consider all evidence admitted at trial. ***See id.*** "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances." ***Commonwealth v. DiStefano***, 782 A.2d 574, 582 (Pa. Super. 2001) (citation omitted). The fact-finder, "while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence." ***Commonwealth v. Watkins***, 843 A.2d 1203, 1211 (Pa. 2003). However, the fact-finder "cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review." ***Commonwealth v. Slocum***, 86 A.3d 272, 276 (Pa. Super. 2014) (citations omitted).

The crime of unlawful contact with a minor is defined, in pertinent part, as follows:

> (a) **Offense defined.**—A person commits an offense if the person is intentionally in contact with a minor . . . for the purpose of engaging in an activity prohibited under any of the following, and either the person initiating the contact or the person being contacted is within this Commonwealth:
>
> (1) Any of the offenses enumerated in Chapter 31 (relating to sexual offenses). [These offenses include rape, statutory sexual assault, aggravated indecent assault, and indecent assault.]

18 Pa.C.S.A. § 6318(a)(1).

A minor is defined as a person under the age of 18 years. ***Id.*** at § 6318(c). Additionally, "contacts" are defined as:

Direct or indirect contact or communication by any means, method or device, including contact or communication in person or through an agent or agency, through any print medium, the mails, a common carrier or communication common carrier, any electronic communication system[,] and any telecommunications, wire, computer[,] or radio communications device or system.

*Id.*

This Court has previously explained that "[e]ven though the statute is titled 'unlawful contact with a minor,' is it best understood as 'unlawful communication with a minor' [because b]y its plain terms, the statute prohibits the act of communicating with a minor for enumerated sexual purposes." *Commonwealth v. Rose*, 960 A.2d 149, 152-53 (Pa. Super. 2008). Additionally, "it matters not whether the communication occurred at the outset of[,] or contemporaneously with[,] the contact; once the communicative message is relayed to a minor, the crime of unlawful contact is complete." *Commonwealth v. Davis*, 225 A.3d 582, 587 (Pa. Super. 2019).

Section 3125 of the Pennsylvania Crimes Code defines aggravated indecent assault of a child less than 13 years of age, in relevant part, as:

**(a) Offenses defined.**—[A] person who engages in penetration, however, slight, of the genitals or anus of a complainant with a part of the person's body for any purposes other than good faith medical, hygienic or law enforcement procedures commits aggravated indecent assault if: . . .

(7) the complainant is less than 13 years of age.

18 Pa.C.S.A. § 3125(a)(7). Critically here, "[d]igital penetration is sufficient to support a conviction for aggravated indecent assault[.]" ***Commonwealth v. Gonzalez***, 109 A.3d 711, 723 (Pa. Super. 2015).

A person commits indecent assault of a person less than 13 years old if the person has indecent contact with the complainant and the complainant is less than 13 years of age. ***See*** 18 Pa.C.S.A. § 3126(a)(7). Indecent contact is "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." ***Id.*** at § 3101. This Court has held that when the defendant's act would not otherwise "occur outside the context of a sexual or intimate situation," the fact-finder may infer that the contact "was done for the purpose of arousing or gratifying [the defendant's] sexual desire." ***Commonwealth v. Evans***, 901 A.2d 528, 533 (Pa. Super. 2006).

Finally, corruption of minors is defined, in relevant part, as:

(a) Offense defined.—

> (i) [W]hoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices[,] or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor in violating his or her parole or any order of court, commits a misdemeanor of the first degree.

***Id.*** at § 6301(a)(1)(i). Corruption of minors includes "actions that would offend the common sense of the community and the sense of decency, propriety[,] and morality, which most people entertain," such as sexual abuse.

*Commonwealth v. Leatherby*, 116 A.3d 73, 82 (Pa. Super. 2015) (citation and brackets omitted).  Our Supreme Court has long held:

> The Commonwealth need not prove that the minor's morals were actually corrupted.  Rather, a conviction for corrupting morals will be upheld where the conduct of the defendant tends to corrupt the minor's morals.  The statute speaks to conduct toward a child in an unlimited variety of ways which tends to produce or to encourage or to continue conduct of the child which would amount to delinquent conduct.

*Commonwealth v. Mumma*, 414 A.2d 1026, 1030 (Pa. 1980) (internal citations and quotation marks omitted).

Here, Culbreath argues that the evidence was insufficient to sustain his convictions of the above offenses because the Commonwealth did not establish beyond a reasonable doubt that he was the person who entered the bedroom at the time of the assault.  Specifically, Culbreath argues that N.R.'s testimony was inconsistent with previous statements she made to Smith and to the forensic interviewer at PCA.  **See** Appellant's Brief, at 22.  In particular, Culbreath points to Smith's unsigned interview with Detective Price, in which Smith said N.R. reported that N.R. had sexual intercourse with N.R.'s brother's cousin.[6]  **Id.**  Culbreath also highlights that N.R. told the forensic interviewer that Culbreath stood during the assault but later testified that he was sitting.  This discrepancy, Culbreath argues, "is indicative of an overall credibility issue with [N.R.'s] testimony."  Appellant's Brief, at 22.  Culbreath thus proffers that N.R.'s testimony was "so unreliable and contradictory that the verdict was

---

[6] As discussed **infra**, Smith's statement to Detective Price was ruled inadmissible hearsay and not presented at trial.

based on what is akin to conjecture." Appellant's Brief, at 26. While Culbreath acknowledges that witness credibility is typically a weight issue for the fact-finder, he cites our Supreme Court's acknowledgement that there is an "exception to the general rule that the jury is the sole arbiter of the facts where the testimony is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture." Appellant's Brief, at 27, quoting **Commonwealth v. Karkaria**, 625 A.2d 1167, 1170 (Pa. 1993).

The trial court rejected Culbreath's sufficiency claim based on N.R.'s testimony, highlighting that N.R. repeatedly identified Culbreath as her assailant from the time she disclosed the assault in 2017 to her trial testimony in 2022. **See** Trial Court Opinion, 10/10/23, at 15.

Our review of the record confirms the determination of the trial court that N.R. has consistently identified Culbreath as her assailant. N.R. identified Culbreath when she first disclosed the assault to her mother in August 2017. **See** N.T. Trial (Jury) Volume 1, 12/23/22, at 144. After reporting the assault to the authorities, N.R. again identified Culbreath as her assailant in a forensic interview at PCA on August 28, 2017. **See** Interview with N.R., in Philadelphia, Pennsylvania (Aug. 28, 2017). At trial, N.R. again identified Culbreath as her assailant in her testimony during direct and cross examination. **See** N.T. Trial (Jury) Volume 1, 12/13/22, at 66-68, 76-85. N.R. also consistently reported that during the assault, Culbreath put his hand on N.R.'s mouth and threatened to harm N.R. if she reported the assault. **See id.**; Interview with N.R., in Philadelphia, Pennsylvania (Aug. 28, 2017).

Viewed in the light most favorable to the Commonwealth, evidence presented at trial was sufficient to prove that it was Culbreath who entered the bedroom when N.R. was assaulted. *See Commonwealth v. Owens*, 649 A.2d 129, 133 (Pa. Super. 1994) ("[I]n a prosecution for sex offenses, a guilty verdict may rest on the uncorroborated testimony of the victim."); *see also* 18 Pa.C.S.A. § 3106 (testimony of complainant need not be corroborated in prosecutions for sexual offenses). In fact, there was no evidence in the record identifying anyone but Culbreath as the assailant, and both N.R. and her mother denied that N.R.'s assailant was anyone else but Culbreath. Any inconsistencies in the evidence were for the jury, sitting as fact-finder, to resolve. *See Commonwealth v. Jacoby*, 170 A.3d 1065, 1081 ("A jury is entitled to resolve any inconsistencies in the Commonwealth's evidence in the manner that it sees fit.").

As to Culbreath's conviction for unlawful contact with a minor, the evidence presented at trial demonstrated that during the assault, Culbreath put his hand on N.R.'s mouth and told her to be quiet as she cried. *See* N.T. Trial (Jury) Volume 1, 12/13/22, at 78-79. As Culbreath continued the assault, he threatened to harm N.R. if she reported the assault. *See id.* at 78-79, 145. In other words, Culbreath directly communicated with N.R. during the assault for the purpose of engaging in a sexual act prohibited under Chapter 31. *See Rose*, *supra*; *Davis*, *supra*. Thus, we conclude that the evidence was sufficient for a jury to convict Culbreath of unlawful contact with a minor.

Likewise, the evidence was sufficient to convict Culbreath of aggravated indecent assault of a person less than 13 years old. The evidence at trial established that Culbreath entered the room in which N.R., then aged 11, was sleeping and digitally penetrated her vagina, *see Gonzalez*, 109 A.3d at 723, and that Culbreath had no good faith medical, hygienic, or law enforcement purpose for his actions. *See* 18 Pa.C.S.A. § 3125(a)(7).

The evidence was also sufficient to convict Culbreath of indecent assault of a child less than 13 years of age. The testimony adduced at trial clearly established that Culbreath digitally penetrated N.R.'s vagina. Moreover, there was sufficient evidence in the record for the jury to conclude that the physical contact did not occur outside a sexual or intimate situation and, thus, to infer that the act was done for the purpose of arousing or gratifying Culbreath's sexual desire. *Evans*, *supra*.

Lastly, the evidence was sufficient to find Culbreath guilty of corruption of minors. N.R. testified that Culbreath, then aged 25, digitally penetrated N.R., then 11 years old. Thus, it is clear that the evidence was sufficient to sustain Culbreath's conviction for corruption of a minor. *Leatherby*, *supra*.

In his second and third issues on appeal, Culbreath challenges the weight of the evidence supporting his guilty verdicts. "The weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Forbes*, 867 A.2d 1268, 1272-73 (Pa. Super. 2005), quoting *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003).

When a defendant challenges the weight of the evidence, "a new trial is warranted only when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Commonwealth v. Morales***, 91 A.3d 80, 91 (Pa. 2014) (citation and quotation marks omitted). On review, this Court "does not substitute its judgment for the finder of fact and consider the underlying question of whether the verdict is against the weight of the evidence, but, rather, determines only whether the trial court abused its discretion in making its determination." ***Commonwealth v. Lyons***, 79 A.3d 1053, 1067 (Pa. 2013). An abuse of discretion "is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless 'the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.'" ***Commonwealth v. Perry***, 32 A.3d 232, 236 (Pa. 2011), quoting ***Commonwealth v. Walls***, 926 A.2d 957, 961 (Pa. 2007).

Culbreath argues that the verdict was against the weight of the evidence for several reasons. First, Culbreath argues that it is unlikely a sexual assault could have taken place in a home crowded with adults and cheerleaders, and while another child was in the same bed as N.R. ***See*** Appellant's Brief, at 23. Further, Culbreath claims that it is "incredible" that N.R. remained at her cheerleading coach's house after the alleged assault occurred instead of returning to her nearby home. ***Id.*** Additionally, Culbreath points to "material inconsistencies" between N.R.'s testimony and previous statements she made

before trial, such as telling Smith that she had sexual intercourse with her older brother's cousin—not Culbreath—and telling the forensic interviewer that Culbreath was standing during the assault instead of sitting, which she stated at trial.[7]  *Id.* at 23.  Culbreath also highlights that there is no physical or forensic evidence that the assault occurred.  *Id.* at 18.  Finally, Culbreath argues that he "presented substantive evidence through several witnesses, that [Culbreath] has a reputation in the community for being peaceful and non-violent, law-abiding and even truthful."  *Id.* at 25.  This character evidence, Culbreath argues, "created a reasonable doubt in itself."  *Id.*

In finding that the weight of the evidence supported the verdict, the trial court observed that "all of the issues argued by [Culbreath] come down to the question of witness credibility," the determination of which fell to the jury as fact-finder.  Trial Court Opinion, 10/10/23, at 16-17.  Thus, it was the jury's prerogative to consider the location and nature of the assault, the veracity of N.R.'s testimony, the strength of Culbreath's character evidence, and any other mitigating circumstances, such as the time between the assault and N.R.'s report.  *See id.* at 16-19.  As to N.R.'s testimony, the trial court clarified that some of the alleged "material inconsistencies" were ruled inadmissible hearsay and do not appear on the record.  *Id.* at 16-17.

Ultimately, the court found:

---

[7] As discussed *infra*, Smith's statement to Detective Price was ruled inadmissible hearsay and not presented at trial.

> [t]he jury had the opportunity to consider all of the competing evidence, the circumstances and location where the assault occurred, all of the inconsistencies between the witnesses' testimony and prior statements, the delayed report, the lack of physical evidence, and evidence of [] Culbreath's good character. After consideration of everything, the jury determined that the witnesses' testimony was truthful and accurate[,] and that the totality of the evidence was adequate to prove the elements of the crimes charged beyond a reasonable doubt. It would be improper for the [c]ourt to discard the determinations of the jury.

*Id.* at 18; *see also Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) ("A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion.").

Our review reveals the trial court did not abuse its discretion in rejecting Culbreath's weight claim. The jury, sitting as fact-finder, heard the evidence and testimony presented at trial, including any discrepancies in N.R.'s testimony and Culbreath's character evidence, and was free to resolve any conflicts. *Forbes*, *supra*. We are satisfied that the trial court reviewed the evidence and relevant legal standards and, having done so, did not abuse its discretion in determining that the jury's verdict did not shock its sense of justice. *See Morales*, *supra*; *Lyons*, *supra*.

In his fourth issue, Culbreath argues that the trial court erred by ruling Smith's statement made to Detective Price was inadmissible hearsay. Culbreath claims the court's refusal to admit the statement was improper because the statement had already been deemed admissible by a judge of co-equal jurisdiction. Culbreath also argues that the statement was permissible

for the limited purpose of impeaching N.R. and that excluding the statement denied him a fair trial. He is entitled to no relief.

"Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). A claim is waived if it was raised for the first time in a Pa.R.A.P. 1925(b) statement. *See Commonwealth v. Coleman*, 19 A.3d 1111, 1118 (Pa. Super. 2011); *see also Commonwealth v. Smith*, 213 A.3d 307, 309 (Pa. Super. 2019) ("where an appellant includes an issue in his Pa.R.A.P. 1925(b) statement, such inclusion does not 'resurrect' a waived claim.") (citation omitted).

Here, Culbreath failed to preserve his argument that the trial court erred by excluding Smith's statement because another judge of co-equal jurisdiction previously ruled the statement to be admissible. At trial, there was a lengthy discussion as to whether Smith's statement was hearsay. *See* Trial (Jury) Volume 1, 12/13/22, 181-203. During that time, Culbreath never argued that a judge of co-equal jurisdiction had ruled the statement was admissible. This argument also was not raised following Culbreath's conviction. In his post-sentence motions, Culbreath challenged the discretionary aspects of his sentence and the weight of the evidence; specifically, Culbreath argued that N.R.'s inconsistent testimony and Culbreath's substantive evidence of good character rendered the verdict against the weight of the evidence. *See* Supplemental Post-Sentence Motion, 6/19/23, at 5-7. The first time Culbreath argued that the trial court erred by not admitting the statement because another judge had ruled it admissible was in his Rule 1925(b) statement.

- 17 -

Therefore, because this specific issue was not properly preserved, it is waived.[8]  ***See Coleman***, ***supra***.

Culbreath also argues that Smith's statement was admissible for purpose of impeaching N.R. because Smith's statement contained different details of the assault and implicated someone other than Culbreath.  ***See*** Appellant's Brief, at 28.  Culbreath posits that Smith's statement, by virtue of having been recorded by Detective Price, was of such strong reliability that it should have been admitted.  ***Id.*** at 30, 34.

---

[8] Even if this issue were not waived, the record reflects that the prior judge, the Honorable Sierra Thomas Street, never actually ruled on this issue.  In support of his claim that the issue "**seems to have previously been decided** by another [j]udge," Appellant's Brief, at 29 (emphasis added), Culbreath cites to the following statement by Judge Street, following a discussion in which the Commonwealth declined to stipulate to N.R.'s statement to Smith:

> THE COURT: So[,] we'll get a new trial date.  Does anybody need a discovery status date to figure out what's going on prior to the next court date?  **I'm kind of telling you where I'm falling on [the issue of admissibility] without knowing more**.  Maybe [the Commonwealth will] have a more compelling argument in [its] favor.  I don't know.  But if there were to be some sort of motion *in limine* or if this is a motion *in limine*, my position is that the stipulation would need to occur at this point.
>                                     . . .
> And for the record, I need to rephrase it.  It's not a stip[ulation] since you're saying you don't agree, but I'm saying the statement would come in.  I'm just correcting what I said.

N.T. Hearing, 6/25/18, at 12, 14.  Culbreath never filed a motion *in limine* and it is clear from the foregoing that Judge Street did not make a definitive ruling on the issue.  Indeed, Culbreath's counsel conceded at trial that he "brought [the issue] to the attention of [Judge Street] and she didn't make a ruling on it."  N.T. Trial, 12/13/22, at 187-88.

Our standard of review for the admission of evidence is well-settled. "The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." *Commonwealth v. Hudson-Greenly*, 247 A.3d 21, 24 (Pa. Super. 2021) (citation omitted).

> [T]he term "discretion" imports the exercise of judgment, wisdom[,] and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice[,] or arbitrary actions.

*Commonwealth v. Goldman*, 70 A.3d 874, 878-79 (Pa. Super. 2013) (citation omitted). Moreover, "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa. Super. 2012) (citation and quotation marks omitted).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Commonwealth v. McCrae*, 832 A.2d 1026, 1034 (Pa. 2003). Hearsay is generally inadmissible unless it falls within one of the exceptions to the hearsay rule provided by the Rules of Evidence, our Supreme Court, or statute. *See* Pa.R.E. 802; *see also Commonwealth v. Savage*, 157 A.3d 519, 524 (Pa. Super. 2017). Additionally, "[a]n out-of-court declaration containing another out-of-court declaration is double hearsay." *Commonwealth v. Laich*, 777 A.2d 1057, 1060 (Pa. 2001). "Hearsay within

hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Pa.R.E. 805.

At trial, Culbreath attempted to introduce Detective Price's written record of his telephonic interview with Smith. The trial court found that the statement implicated two levels of hearsay: (1) the written document was an out-of-court statement produced by Detective Price, and (2) the document contained Smith's out-of-court recollection of what N.R. stated. "Because [Culbreath] was trying to prove that N.R. [made] the prior inconsistent statement, i.e., that N.R. said her older brother's cousin was the person who touched her, [] Smith's out-of-court statement asserting that N.R. said those things needed to [satisfy] a hearsay exception." Trial Court Opinion, 10/10/23, at 11; *see also* Pa.R.E. 805. The trial court ultimately rejected Culbreath's four arguments to demonstrate a hearsay exception: present sense impression, *see* Pa.R.E. 803(1); excited utterance, *see* Pa.R.E. 803(2); statement by party opponent, *see* Pa.R.E. 803(25); and unavailable witness, *see* Pa.R.E. 804(a)-(b).

Upon review, we conclude that the trial court did not abuse its discretion in ruling Smith's statement to Detective Price was inadmissible hearsay. Detective Price's written recording of his interview with Smith contained multiple levels of hearsay because it relayed N.R.'s out-of-court statement through Smith's out-of-court statement. *See Laich*, *supra*. Thus, Culbreath was required to show that both Detective Price's and Smith's out-of-court

statements conformed to a hearsay exception for Culbreath to admit the written statement at trial. *See* Pa.R.E. 805.

Here, Smith's statement was not a present sense impression, as at least four weeks elapsed between the time N.R. disclosed the assault to Smith sometime in August 2017 and Smith's interview with Detective Price on September 28, 2017. *Compare Commonwealth v. Stephens*, 74 A.3d 1034, 1037 (Pa. Super. 2013) (affirming inadmissibility of phone call in which defendant refused to confess to various sex crimes because defendant knew of allegations for weeks beforehand; defendant "was not contemporaneously perceiving the [allegations] at the time of the intercepted phone call.") *with Commonwealth v. Cunningham*, 805 A.2d 566, 573 (Pa. Super. 2002) (affirming admission of 911 calls that occurred as crime was unfolding). Similarly, the passage of time, combined with the lack of evidence demonstrating that Smith's statement was a spontaneous declaration caused by overwhelming emotion, renders Smith's statement inadmissible under the excited utterance exception. *See Commonwealth v. Carmody*, 799 A.2d 143, 147 (Pa. Super. 2002) (in applying excited utterance exception, "[t]he crucial question, regardless of the time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance") (citation and quotation marks omitted).

The opposing party exception is clearly inapplicable, as Smith was neither a party nor an agent of a party in the case. *See* Pa.R.E. 803(25).

Finally, Smith was not an unavailable witness. Smith was not subject to a subpoena, meaning she did not refuse a court order to testify. *See* N.T. Trial (Jury) Volume 2, 12/14/22, at 88-91; *see also* Pa.R.E. 804(a)(2). It is also not the case that Culbreath was unable, by process or other reasonable means, to secure her testimony. *See* N.T. Trial (Jury) Volume 1, 12/13/22, at 193 (Culbreath's attorney informing the court: "I could have gotten [Smith] by getting in touch with a defender['s] office or any private office in Virginia and asked them to subpoena her with a Virginia subpoena . . . or send a Pennsylvania subpoena down there, but it was not cost effective."). Indeed, when asked if Smith was subject to a subpoena, defense counsel concluded, "when I thought about it, I didn't want to see [Smith because] I have her statement." *Id.*; *see also Commonwealth v. Cruz-Centeno*, 668 A.2d 536, 541 (Pa. Super. 1995) ("A witness who cannot be found at the time of trial will be deemed unavailable only if a good-faith effort to locate the witness and compel his [or her] attendance at trial has failed.") (citation and internal quotation marks omitted). Thus, Smith's statement does not fall within any established hearsay exception.

In light of the foregoing, we conclude that trial court did not misapply the law relating to hearsay, hearsay within hearsay, and hearsay exceptions. Moreover, Culbreath does not argue, and our review does not reveal, that the trial court's judgment was manifestly unreasonable or the result of partiality, prejudice, bias, or ill will. *See Perry*, *supra*. Therefore, the trial court did not abuse its discretion by excluding Smith's out-of-court statement at trial.

Culbreath also argues that the exclusion of Smith's statement denied him a fair trial because it excluded substantive and reliable evidence from the jury's consideration. **See** Appellant's Brief, at 34. Culbreath claims that Smith's statement was a central part of his defense, making its exclusion unfair and overly prejudicial. **See id.** at 31. This claim is meritless.

As noted above, the decision to admit evidence is within the discretion of the trial court and will not be overturned absent an abuse of discretion. **See Hudson-Greenly**, **supra**. "A defendant has a fundamental right to present evidence, so long as the evidence is relevant and not subject to exclusion under our Rules of Evidence." **Commonwealth v. Patterson**, 91 A.3d 55, 71 (Pa. 2014). "If a trial [court's] error does not deprive the defendant of the fundamentals of a fair trial, his conviction will not be reversed." **See Commonwealth v. Noel**, 104 A.3d 1156, 1169 (Pa. 2014) (citation omitted).

As noted above, the trial court did not abuse its discretion when it excluded Smith's statement. Moreover, Culbreath ignores the other ways in which he was able to explore the substance of Smith's statement at trial. For instance, Culbreath confronted N.R. and her mother regarding whether N.R. initially identified another person as her assailant. Under oath, both N.R. and C.J.-R. denied that N.R. had made such a statement. **See** N.T. Trial (Jury) Volume 1, 12/13/22, at 102, 154-55. Culbreath also overlooks the fact that Smith was not an unavailable witness; she was an **unwilling** witness, and Culbreath did not attempt reasonable means to secure her presence at trial.

- 23 -

Indeed, defense counsel conceded that he "could have gotten" Smith by serving her a subpoena but concluded that it was "not cost effective." *Id.* at 193. In light of the foregoing, we conclude that the trial court did not deprive Culbreath of a fair trial by excluding Smith's statement, because Culbreath was able to confront witnesses about the substance Smith's statement and chose not to pursue alternative means to obtain Smith's in-person testimony. *See Noel*, *supra*.

In his final issue, Culbreath challenges the constitutionality of Subchapter H of SORNA on four grounds. First, Culbreath argues that SORNA's irrebuttable presumption that he is a high-risk offender is a violation of due process, as there is no statutory mechanism to rebut the presumption. Second, Culbreath claims that SORNA's reporting requirements unconstitutionally deprive him of his reputational rights. Third, Culbreath argues that because the current version of SORNA was enacted after the alleged assault, the retroactive application of its registration requirements is an *ex post facto* violation, as the requirements are punitive. Fourth and finally, Culbreath contends that the lifetime reporting requirement is equivalent to an illegal sentence that extends beyond the statutorily-available maximum punishments for his crimes.[9]

_____

[9] The trial court did not address Culbreath's constitutional claims, instead deferring them to our judgment.

We address Culbreath's first and second sub-arguments together. Since the time that Culbreath filed his appeal, our Supreme Court has had occasion to consider "whether the General Assembly's determination, in [SORNA], that individuals who commit sexual offenses pose a high risk of committing additional sexual offenses constitutes an unconstitutional irrebuttable presumption violative of due process, because it impairs the right to reputation under the Pennsylvania Constitution." ***Commonwealth v. Torsilieri***, 316 A.3d 77, 79 (Pa. 2024) (footnotes omitted) ("***Torsilieri II***").[10]

Our Supreme Court explained:

> The General Assembly has memorialized this presumption in its legislative findings: "Sexual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest." 42 Pa.C.S.[A.] § 9799.11(a)(4). To challenge such assumptions under the irrebuttable presumption doctrine, a challenging party must demonstrate: (1) an interest protected by the due process clause; (2) utilization of a presumption that is not universally true; and (3) the existence of a reasonable alternative means to ascertain the presumed fact.

***Id.*** at 80 (some internal citations omitted).

Like Culbreath, the appellee in ***Torsilieri II*** argued that Subchapter H is both unconstitutional as violative of due process and also constitutes a deprivation of his substantive constitutional right to his reputation. Though presented as separate challenges, the ***Torsilieri II*** Court noted that

---

[10] We note the facts of the present case are akin to those of ***Torsilieri II***. In both cases, the defendants were convicted of both indecent assault and aggravated indecent assault and, thus, were automatically categorized under SORNA's Subchapter H as Tier III sexual offenders. Additionally, neither Torsilieri nor Culbreath were found to be sexually violent predators.

Torsilieri's "broadside [due process] challenge to SORNA is inextricably intertwined with the similar claim of harm to reputation caused by SORNA's allegedly erroneous presumption that sexual offenders pose a high risk of reoffense." *Id.* at 92. Having found both arguments to be "synonymous," the court addressed them as one. Accordingly, we consider Culbreath's reputation and irrebuttable presumption challenges together.

In *Torsilieri II*, our Supreme Court first observed that the first prong of the irrebuttable presumption doctrine was not at issue, as there was no "meaningful[] dispute that the right to reputation is protected by the due process clause and that the designation as a sexual offender, based upon a presumption of posing a high risk of recidivism, impacts one's right to reputation." *Id.* at 97 n.13.

Turning its focus to the second prong, the *Torsilieri II* Court clarified that "to meet his heavy burden of establishing that the General Assembly's presumption was not universally true, [the a]ppellee was required to establish that there exists a scientific consensus that sexual offenders pose no greater risk of committing additional sexual crimes than other groups not subject to similar registration laws." *Id.* at 98-99. After review, the Court stated:

> [h]ere, [the a]ppellee's own experts concede that adult sexual offenders reoffend at a rate of at least three times higher than other individuals convicted of non-sexual offenses. Accordingly, rather than refuting it, the evidence **supports** the legislative presumption; the evidence validates the statutory underpinnings of Subchapter H. We need go no further. Having reviewed the arguments and the evidence presented below, we find that the evidence does not demonstrate a consensus that the presumption at issue is not universally true.

- 26 -

*Id.* at 99-100 (internal citations and footnote omitted) (emphasis in original).

In light of the Court's conclusion, we reject Culbreath's claim that SORNA's presumption that sexual offenders are at high risk of reoffending violates his due process rights and reputational interests.

Culbreath's third sub-argument—that the application of SORNA in his case is an *ex post facto* violation because its reporting requirements are punitive—was similarly rejected by our Supreme Court in ***Torsilieri II***.

We begin by noting that, when, as here, sexual offender registration laws are applied retroactively, three questions arise:

> First, a court must ask when the initial offense was committed. Second, the court must ask whether the challenged law was enacted after the occurrence of the triggering offense and was then applied retroactively. If so, the final question is whether that retroactive law is punitive or increases the penalty for the existing crime.

***Commonwealth v. Santana***, 266 A.3d 528, 537 (Pa. 2021). Thus, the key inquiry here is whether the registration requirements applicable to Culbreath are punitive. The ***Torsilieri II*** Court explained:

> Whether a statute is punitive in nature is a threshold question for determining the viability of the various constitutional challenges brought [], including whether the legislation unconstitutionally usurps judicial power in violation of the separation of powers doctrine, violates the United States Constitution's prohibition on cruel and unusual punishment, and infringes upon the right to a trial by jury by failing to require that facts that increase the punishment imposed on the underlying crime be found by a reasonable doubt. It is a gateway inquiry, as legislation must be deemed to be in the nature of criminal punishment to invoke the protections of these constitutional provisions.

*Id.* at 80 (footnotes omitted).

To answer this question, our Supreme Court applied the ***Mendoza-Martinez***[11] test, a "two-part test consist[ing] of first determining whether the expressed statutory purpose is to impose punishment, and if not, whether the statutory scheme is so punitive in effect as to negate the legislature's stated non-punitive intent, as assessed by the seven ***Mendoza-Martinez*** factors." ***Id.*** at 100. These factors are:

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment[—]retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned[.]

***Mendoza-Martinez***, 372 U.S. at 168-69.

The ***Torsilieri II*** Court first recognized that the parties agreed that "the clearly expressed legislative purpose, findings, and declaration of policy all establish that [] the General Assembly desired to enact a civil, regulatory scheme." ***Torsilieri II***, 316 A.3d at 102; ***see also*** 42 Pa.C.S.A. § 9799.11(b)(2) (clarifying that Subchapter H "shall not be construed as punitive"). Thus, the Court turned to the ***Mendoza-Martinez*** factors, establishing first that "[o]nly the 'clearest proof' of the punitive effect of law will overcome its expressed non-punitive intent, and we must examine the entirety of the statutory scheme in order to make this assessment." ***Torsilieri***

---

[11] ***Kennedy v. Mendoza-Martinez***, 372 U.S. 144 (1963).

*II*, 316 A.3d at 102, quoting *Muniz*, 164 A.3d at 1208. Additionally, the Court noted that the third and fifth factors—whether the sanction comes into play only after finding *scienter*, and whether the behavior it governs is already a crime—"are of little significance" to the inquiry. *Torsilieri II*, 316 A.3d at 102.

Regarding the first *Mendoza-Martinez* factor, whether Subchapter H involves an affirmative disability or restraint, the Supreme Court found persuasive "the fact that Subchapter H reduces, for the first 25-year period, the minimum number of in-person visits for Tier III registrants to 34 from the original version of SORNA," which required a minimum of 100 visits. *Id.* at 104. The Court also found persuasive Subchapter H's removal provision, which exempts from various registration requirements Tier III offenders who, after at least 25 years have elapsed from their initial registration, successfully petition the sentencing court for an exemption. *Id.*; *see* 42 Pa.C.S.A. § 9799.15(a.2). The Court concluded that the first *Mendoza-Martinez* factor weighed in favor of finding Subchapter H nonpunitive.

Conversely, our Supreme Court found that the second *Mendoza-Martinez* factor—whether Subchapter H's requirements have historically been regarded as punishment—weighed in favor of finding Subchapter H to be punitive. The Court noted that, "[i]n making this assessment with respect to SORNA, our Court has historically focused on two aspects: (1) whether the scheme at issue mimicked historical forms of public shaming; and (2) whether the scheme significantly resembled probationary sentences." *Torsilieri II*,

316 A.3d at 104. As to the first aspect, the Court, guided by its decision in *Commonwealth v. LaCombe*, 234 A.3d 602 (Pa. 2020), held that SORNA's sex offender registry publication provisions—which are accessible by the public through the internet—are analogous to public shaming punishments. *See Torsilieri II*, 316 A.3d at 105. As to the second aspect, the Court noted that the penalties for noncompliance with SORNA's publication provisions are located in the Crimes Code and are "probation-like." *Id.* The Court concluded that these aspects tilted the second *Mendoza-Martinez* factor in favor of finding Subchapter H punitive. *Id.*

The Court then addressed the fourth *Mendoza-Martinez* factor, whether the operation of Subchapter H promotes the traditional aims of punishment. As it did in *LaCombe*, the Court found that factor four also weighed in favor of finding Subchapter H punitive, as it "promotes retribution and has a deterrence component." *Id.* at 106. *See LaCombe*, 660 A.3d at 624-25 ("[t]he underlying conviction is the necessary and sufficient trigger for registration; the individual cannot avoid retribution by doing nothing further") (internal quotation marks and citation omitted). Moreover, the Court found that SORNA's lifetime registration and notification requirements have some deterrent effect and, thus, concluded the fourth factor weighed in favor of finding Subchapter H punitive. *See Torsilieri II*, 316 A.3d at 106.

The Court then turned to the sixth *Mendoza-Martinez* factor, considering "whether there exists a nonpunitive alternative purpose to which the statute rationally may be connected." *Id.* The Court noted that the stated

legislative purpose of Subchapter H is "to protect public safety through registration and community access to information regarding sexually violent predators" and that it had previously deferred to the General Assembly's findings in that regard, "concluding that there was an alternative purpose other than punishment." *Id.* at 107. *See* 42 Pa.C.S.A. § 9799.11 (setting forth legislative findings, declaration of policy, and scope with respect to SORNA). The Court concluded:

> Having found above that [the a]ppellee has not met his high burden of establishing that the presumption that sex offenders pose a high risk of reoffense is not true, and accepting that this presumption serves as the basis for the legislature's desire to protect the public from sexual offenders, as in *LaCombe*, we conclude that there is a purpose other than punishment to which Subchapter H is rationally connected: informing and protecting the citizenry regarding sexual offenders the legislature has found to pose a high risk of reoffense. Thus, we believe that this factor heavily weighs in favor of finding Subchapter H to be nonpunitive.

*Id.*

Lastly, the Court considered the seventh *Mendoza-Martinez* factor— whether Subchapter H is excessive in relation to SORNA's nonpunitive intent. In finding that this factor "weighs to a great degree in favor of finding Subchapter H to be nonpunitive," the Court noted:

> [T]he General Assembly has removed certain qualifying offenses, lowered the registration periods for many offenses, and reduced in-person reporting requirements. As for the continued requirement of in-person visits, we find them to be a requisite for maintaining an accurate registry, which is necessary for public protection. Moreover, Subchapter H includes removal procedures for lifetime registrants, which the absence of in the prior version of SORNA had troubled our Court.

- 31 -

***Id.*** at 109.

After analyzing and balancing the relevant ***Mendoza-Martinez*** factors, our Supreme Court concluded:

> In our view, weighing the ***Mendoza-Martinez*** factors does not compel the conclusion that Subchapter H is punitive. Here, the General Assembly created a tier-based classification system organized by seriousness of the offense, which, in turn, is tied to the degree of harm caused by the crime. This is a policy-based decision vested in the legislature.

***Id.***

Accordingly, as our Supreme Court has determined that Subchapter H's reporting requirements are non-punitive, we reject Culbreath's *ex post facto* challenge.

Fourth and finally, Culbreath claims that Subchapter H's reporting requirements are equivalent to an illegal sentence because they exceed the statutory maximums of the crimes of which he was convicted. He is entitled to no relief.

As discussed in detail above, the ***Torsilieri II*** Court found the registration requirements under Subchapter H to be non-punitive. As such, its registration mandates cannot form the basis of an illegal sentencing claim. ***See Commonwealth v. Zepprinans***, 272 A.3d 470 (Pa. Super. 2022) (Table) (concluding that because registration requirements under Subchapter I of SORNA are non-punitive, appellant's lifetime registration requirement cannot form basis of illegal sentencing claim). ***See*** Pa.R.A.P. 126(b) (non-

precedential decisions of this Court filed after May 1, 2019 may be cited for their persuasive value). Accordingly, this claim is meritless.[12]

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/18/2024

---

[12] Because this claim purports to challenge the legality of Culbreath's sentence, it is non-waivable. *See Commonwealth v. Foster*, 17 A.3d 332, 334 n.1 (Pa. 2011) (challenge to legality of sentence never waivable). Nevertheless, we note that it is an appellant's duty to present arguments that are sufficiently developed for our review. *In re R.D.*, 44 A.3d 657, 674 (Pa. Super. 2012). "The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities." *Id.*, quoting *Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007). This Court "will not act as counsel and will not develop arguments on behalf of an appellant. Moreover, when defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived." *Id.* at 771.

Here, Culbreath's analysis of his illegal sentencing claim is limited to the following, without citation to any relevant authority: "Additionally, the lifetime reporting requirements extend beyond the statutory maximums of the instant offenses. . . . It is also an illegal sentence because the probation-like conditions will last for his entire life, well beyond the statutory maximums of the charges for which he was convicted." Appellant's Brief, at 38, 41. These bald statements, without legal support, are woefully insufficient and would otherwise result in waiver. *Hardy*, *supra*.

- 33 -